[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Bruce and Leslie Jarson, sue the defendants, Frederick Gunther and Diana Ricci, for alleged misrepresentation and breach of contract arising from the sale of residential property by the defendants to the plaintiffs. On April 5, 2001, this case was tried to the court, and the court finds the following facts.
Early in 1999, the defendants placed their residence, located at 1183 Newgate Road, West Suffield, on the market. At that time, the defendants had owned and lived at the house for about three years. The defendants received an offer to purchase the property from another couple for $236,125. On April 9, 1999, the defendants accepted that offer, but the prospective buyers required a Hubbard clause contingency. This clause made the sale of the defendant's home dependent on the purchaser's securing of CT Page 5114 a buyer for their present abode. Under the Hubbard provision, the defendants were permitted to continue to offer the property for sale to others and sell their residence to a buyer who needed no Hubbard clause.
The plaintiffs fit this description and were very eager to acquire the defendant's residence. They engaged in the unusual course of retaining a home inspector, Allied Property Inspection Co., to examine the house and issue a report before a contract to buy the home was negotiated. On April 10, 1999, Paul Colasanto of Allied conducted the inspection. While one of the defendants, Gunther, was present and accompanied Colasanto during his perusal of the home, the plaintiffs were absent attending to unrelated matters.
So anxious to purchase the defendant's property were the plaintiffs that they made an offer before the inspection report was available and then raised their offer without having received any response from the defendants to the earlier offer. On April 12, 1999, the parties signed a written contract for the purchase and sale of the residence for $242,000.
Shortly thereafter, Colasanto's report was completed and forwarded to the plaintiffs. His report mentioned those conditions and deficiencies which he suggested ought to be addressed. Among these conditions and defects were a loose railing and loose boards on a landing to a spiral staircase adjacent to a wood deck, the negative grade surrounding a bulkhead area which might allow water to enter the basement, evidence that a small amount of water had previously penetrated the foundation and enter the basement, the presence of an operable sump pit and pump, a broken insulation seal on the patio door glass, a loose connection for a commode located on the first floor, leaking faucets in two bathroom sinks, an unattractive silicon caulk repair of a fiberglass tub and shower unit in one of the second floor bathrooms, the same tub and shower unit drained water slowly and had a diverter lever, used to select a tub faucet or shower spray flow of water, which was stuck in the shower position. Colasanto also noted that the drain for that tub and shower unit had been retrofitted in the past.
Based on the concerns noted in the report, on April 17, 1999, the plaintiffs requested that the defendants repair certain of the defects which they denoted by circling the item numbers on a copy of Colasanto's report. The defendants responded to this request by a letter, dated April 20, 1999, in which they indicated which of the requested repairs they were willing to make in order to close the transaction.
The defendants were very cooperative with respect to the plaintiffs' requests to visit the property and conduct other inspections. Indeed, the CT Page 5115 defendants permitted the plaintiffs to have a pool inspection performed when they had no contractual obligation to do so.
Before the closing, the defendants indicated that the agreed upon repairs had been made. On June 29, 1999, the closing occurred. At the closing a dispute arose as to whether certain of the promised repairs had been adequately performed. Four days before the closing the plaintiffs and Colasanto revisited the premises for a final inspection, and this visit generated the plaintiffs' dissatisfaction.
The plaintiffs initially demanded a $5000 credit and left the closing. Upon their return, the parties negotiated a resolution whereby the defendants would give a $750 credit to the plaintiffs as a final disposition of the plaintiffs' grievances regarding the defendants' repairs under their April 20, 1999, agreement to make such repairs. Having overcome this hurdle, the conveyance of the property was executed.
Additional facts will be supplied where appropriate.
 I
In the first count of the amended complaint, the plaintiffs allege that the defendants made fraudulent or negligent misrepresentations which induced the plaintiffs to purchase the property. Specifically, the plaintiffs contend that the defendants misrepresented that the house was wired for cable television, that the basement was not prone to flooding or leakage, and that the swimming pool liner was free of tears and leaks.
 A.
As to the claim regarding cable service, the court finds that the plaintiffs have failed to prove that the defendants' disclosure was a false one. The plaintiffs based their contention of misrepresentation on an MLS "Residential Property Condition Disclosure Report" filled out by the defendants and given to the plaintiffs on April 6, 1999. That report describes the residence and its features. The letter "Y" was noted next to the word "Cable."
The defendants' realtor, Claudette Alaimo, testified that it is customary for a "Y" next to "Cable" to signify merely that cable service is available for that residence and not that the house has been wired to accept that service previously. The court finds this testimony competent and credible. As a result, the court determines that the defendants disclosure was truthful as to this point because cable service was CT Page 5116 available.
 B.
The plaintiffs' next claim of misrepresentation relates to the MLS disclosure as well as oral statement made by Gunther to the plaintiffs. In that report, the defendants characterized the amount, frequency, and location of "water/seepage/dampness" in the basement as "occasional dampness." The defendant made this entry after describing, accurately and completely, to their realtor, Alaimo, their knowledge of the presence of a few gallons of water forming a puddle, after a period of unusually heavy precipitation, a few times in three years. Alaimo advised the defendants that the phrase "occasional dampness" was typically used to describe the condition of the basement. Gunther had reiterated this characterization to the plaintiffs when they inquired regarding the matter and in particular with reference to a foundation crack.
The plaintiffs resided in the house during the summer of 1999 with no water problems in the basement. Sometime in the autumn of 1999, several days of heavy rain fell. The plaintiffs noticed a puddle of water had formed in the basement containing about four gallons of water. The plaintiffs employed a wet vacuum five or six times over the next few days to eliminate the puddle. After a period of heavy rain or snow melt, the puddle occasionally reappeared.
The plaintiffs' experience and the defendants' knowledge were consistent as to the seepage of water following heavy precipitation. The defendants found the problem to be a minor one and kept expensive furniture, including a wide screen television, in the finished portion of the basement, which portion was also carpeted.
The plaintiffs' characterize the problem as "flooding", in contrast to the defendants description of "occasional dampness." The court characterizes the phenomenon as occasional puddling.
In order for the plaintiffs to prevail on a theory of fraudulent misrepresentation, they must prove, by clear and convincing evidence (1) that the defendants made false representation of fact; (2) that they knew the representation was false; (3) that they made the representation to induce the plaintiffs to buy the residence; and (4) that the plaintiffs acted upon the false representation to their injury, Statewide GrievanceCommittee v. Egbarin, 61 Conn. App. 445, 454 (2001).
In this case, the court finds that the plaintiffs have failed to prove, by clear and convincing evidence, that the defendants knew that the phrase "occasional dampness" mischaracterized the true nature of the CT Page 5117 infrequent but recurrent water seepage problem in the basement. The defendants honestly relied on their realtor's advice that in the realty trade this phrase accurately portrayed the circumstance they experienced with their home.
The plaintiffs, however, have also alleged negligent misrepresentation regarding this disclosure and portrayal. Negligent misrepresentation requires the plaintiffs to prove by a preponderance of the evidence, (1) that the defendants made a false representation of fact; (2) that they failed to exercise reasonable care in obtaining or communicating the false information; (3) that the representation was made to induce the plaintiffs to buy the residence; and (4) the plaintiffs justifiably relied on the representation to their detriment, D'Ulisse-Cupo v. Board ofDirectors, 202 Conn. 206, 219 (1987); Williams Ford, Inc. v. HartfordCourant Co., 232 Conn. 559, 579 (1995).
The court finds that the plaintiffs have proven each element of their claim of negligent misrepresentation. Despite the suggestion of their realtor, the defendants ought to have known that using the word "dampness" to describe the seven to eight foot puddles which occasionally formed in the basement after heavy precipitation. The defendants acknowledged using a wet vacuum themselves to remedy the problem. One does not need a five gallon wet vacuum to remove "dampness."
Prompted by Colasanto's comment regarding evidence of a small quantity of water in the basement, the plaintiffs specially inquired of the defendant's regarding this issue and the foundation crack. The defendants should have known, under these circumstances, that the phase "occasional dampness" misinformed the plaintiffs as to the extent of water seepage which they had experienced. Similarly, the plaintiffs relied on the defendants' disclosures that occasional dampness was encountered to continue with the purchase of the house. The plaintiffs were concerned enough about this potential problem to ask the defendants to relate their knowledge expressly.
The plaintiffs have reasonably incurred expenses necessary to correct the seepage problem understated by the defendants in the amount of $4565. The costs covered the excavation of the ground in the area of the foundation crack and pipelines to the well, the patching and waterproofing of the foundation, and the installation of a more effective sump pump system.
The plaintiffs claim an additional $1700 to perform other foundation repairs, but the court finds that the problem to be corrected by this repair is unrelated to the negligent misrepresentation made by the defendants. CT Page 5118
 C.
The third purported misrepresentation relates to the existence of tears in and resulting leakage from the swimming pool liner. The plaintiff adduced no credible evidence that the liner was torn or leaked. Therefore, the court finds that the plaintiffs have failed to prove any false statement of fact was made by the defendants in this regard.
The court rules in favor of the plaintiffs as to the negligent misrepresentation aspect of the first count and awards damages as to that count of $4565. Because the court has rejected the fraud claim, no punitive damages are awarded.
 II
Turning to the second count, the plaintiffs allege that, after signing the purchase and sale agreement, the parties entered into an additional contract whereby the plaintiffs agreed to make certain plumbing repairs of defects noted in Colasanto's report to be performed by a qualified plumber; that a pane of glass in a patio door was broken after the purchase and sale agreement was made and before closing; that a pool cover was removed in violation of the agreement; and that a wood stove that ought to have been removed was not.
 A.
The defendants consented to fix certain of the deficiencies listed by Colasanto with respect to a tub and shower unit in a second floor bathroom. The defendants agreed to use a qualified plumber for this purpose. At the closing, the defendants produced an invoice from the plumber who they indicated had made the repairs, George Laws.
Three days after taking possession of the house, Leslie Jarsen filled this tub with water to bathe her young son. The water remained in the tub while she dried and dressed the child. She then opened the drain to release the water.
A short time later, the plaintiffs observed that water was dripping from the first floor kitchen ceiling at a spot just below the second floor bathroom. The drain pipe from that tub and shower unit had deteriorated and leaked. The leakage stained a portion of the kitchen ceiling. The plaintiffs contend that had the defendants engaged a qualified plumber to make the agreed upon repairs, this mishap would have been avoided. The defendants counter that they agreed to fix the defects described by Colasanto which, with respect to this tub and shower unit, CT Page 5119 were a jammed diverter control and slow draining. They argue that these defects were remedied even though the repairs were performed by themselves and not a qualified plumber.
Colasanto had found that the tub drained slowly, that an unattractive silicon caulk repair to a hole in the fiberglass had been applied in the past and that the diverter control appeared stuck in one position. The defendants engaged George Laws, a social acquaintance, to look at the silicon patch, fix the drain problem, and unlock the diverter control, among other plumbing repairs.
Laws was a registered plumber's apprentice for eleven years, working for a variety of plumbing firms. He never obtained a plumber's license because he was illiterate and could not take the written test. The question of whether an experienced plumber's apprentice, rather than a licensed plumber, met the parties agreement that a "qualified" plumber would be hired to do the work appears irrelevant in this case. The irrelevancy of that issue stems from the fact that Laws never actually made the repairs to the tub unit in question.
Gunther remembered that he had intentionally locked the diverter control in the shower position and simply unjammed it himself. Similarly, Gunther recognized that the slow drainage was the result of a hair clog. He removed the hair obstruction, and the tub then drained freely. The defendants never agreed to redo the silicon patch, but merely to have a plumber "look" at it. Because Laws believed the issue was merely a cosmetic one, he never attempted to address that defect. Also, the plaintiffs acknowledge that they had no evidence that any water leaked through the silicon caulk repair.
Rather, the plaintiffs argue that if, instead of removing the hair clog himself, Gunther had hired a professional plumber, that professional would have detected the weakened condition of the drain pipe and its connection to the drain and repaired it. This argument is simply conjecture. The only obligation under the repair agreement was that the slow draining, which was the defect cited by Colasanto, would be fixed. It was fixed by removing the blockage of hair. It is speculative that a plumber might have noticed the fragile state of the drain pipe. No expert testimony was proffered to support that conclusion.
The court finds that the defendants breached the repair agreement by unclogging the drain themselves but that this breach did not cause the damage they claim, that is, the later leaking of the drain pipe and staining of the kitchen ceiling. There is no claim that the tub drained slowly after Gunther removed the obstruction. CT Page 5120
 B.
A glass pane in a patio sliding door was broken sometime between the signing of the purchase and sale contract and the closing. Under paragraphs 12 and 13 of the contract, the defendants bore the risk of damage to the premises beyond ordinary wear and tear. The broken pane falls outside of normal wear and tear.
The reasonable cost to repair the broken pane was $230. The court finds the defendants liable for this expense.
 C.
The plaintiffs also claim that the defendants violated their obligation to-the plaintiffs by removing a pool cover. The defendants discarded the pool cover because it was in very poor condition when they opened the pool.
In the April 20, 1999, letter from the defendants responding to the plaintiffs requests for repairs, the defendants agreed to make some of the repairs requested. That letter also contains an unsolicited statement of the defendants' intent to open the pool in June 1999 and to leave the pool equipment for the plaintiffs' use.
Paragraph 3 of the purchase and sale contract of April 12, 1999, excludes from the conveyance personalty located on the property except for certain listed items. The pool cover is omitted from this list. Thus, under the contract the defendants assumed no obligation to leave the pool cover.
The plaintiffs never demanded nor requested that the pool equipment be left as part of the transaction. The defendants simply expressed an intention to do so. The doctrine of consideration is fundamental in the law of contracts, and the general rule is that, in the absence of consideration, an executory promise is unenforceable, Keefe v. NorwalkCove Marina, 57 Conn,. App. 601, 606 (2000). The plaintiffs rendered no consideration for the defendants' promise to leave the pool equipment. The plaintiffs were bound to buy the residence for the contract price regardless. A promise to do that which one is already bound by the contract to do is insufficient consideration to support enforcement of an additional term by the other party to the contract, New England RockServices, Inc. v. Empire Paving, 53 Conn. App. 771, 776 (1999). A modification of an agreement must be supported by valid consideration and requires a party to do something beyond and different from the original obligation, Id. CT Page 5121
In the present case, the defendants unilateral promise to leave the pool accessory was made without creating any new obligation to the plaintiffs. The executory promise to leave the pool cover was, therefore, unenforceable.
Even if enforceable, the plaintiffs suffered no damages because the pool cover, which was discarded by the defendants, was of very poor quality and little value. Any obligation the defendants might have had was to leave the pool cover as it then existed and not to provide a better one.
 D.
As for the plaintiffs final claim, the failure to remove a wood stove, the court finds that the defendants offered to leave the stove and the plaintiffs expressed delight at the prospect. The plaintiffs cannot now be heard to complain about receiving what they consented to accept.
In summary, the court rules for the plaintiffs on the first count in an amount of $4565 and on the second count in an amount of $230 for a total award of damages of $4795.
SFERRAZZA, J.